Spear, J.
The evidence shows that the deceased was about sixty years of age, a traveling salesman by occupation, and, at the time of the occurrence, in good health and in full possession of his mental faculties. He was drowned while crossing at a public ford through a slough caused by back water from the Tombigbee river, near Vienna, in the state of Alabama, on the afternoon of December 27, 1892. The ford was a part of the state road lying between a cross-roads settlement, known as Bun tins, and Vienna, the places being about nine miles apart. There was no other public road connecting the two points, although there was a by-way through plantations around by a place called the Lee place, some three and a half miles farther, which way also led over a slough caused by like back water, the condition of which was not then known. Hubbell had traveled the state road twice* a year for thirteen years, and was more or less acquainted with the ford where the occurrence took place. He had stayed near Buntins the night of the 26th, and left that place about three o’clock, in the afternoon of the 27th, in a buggy drawn by.two horses hired of a livery man near there, and driven by a colored man named Emmitt Cavett. It was understood in the neigh *522 borhood that a colored boy, having in charge some mules, a few days before, had to go around by the Lee place because the water at the ford was up, so that fording was thought to be dangerous, and this information was conveyed to Hubbell, but the water at the ford was subject to rapid changes, and might be high at one time and easily fordable in a few hours after.
Hubbell made inquiries of a number of persons living in the vicinity of Buntins as to its condition. The evidence tends to show that opinions were expressed,. some favorably, and others unfavorably with respect to the presence of danger there, but no one claimed to have knowledge, and the exact condition of the ford that afternoon was not known. There had been a little rain thereabouts within the few dajTs past, but not much, and the roads were fairly good. It had rained above.
Vienna was on Hubbell’s regular route, and was to be his next stopping place. He had, upon his person, some seven or eight hundred dollars in money, collected within the two or three days previous.
On the way to the ford, and a short distance from Buntins, the driver turned off the state road intending to drive around by the Lee place. Hub-bell stopped him and a conference ensued in which the driver said to Hubbell that one Wilder had told him that they could not go the direct road, because, he said, he had sent a boy over there and he couldn’t cross, and that they would have to go by the Lee place. Wilder was one of those of whom Hubbell had inquired and who mentioned to Hubbell the circumstance of the boy with the mules which was two days before. By direction *523 of Hubbell, the driver, against his own inclination, turned back, and they continued on the public road. The driver’s objection expressed later, was not that he feared bodily danger, but it was cold, and he feared getting wet.
They presently reached the slough. The road dipped into the water. They stopped. It was thirty to thirty-five feet to the opposite slope. There was no current. Hubbell said to the driver that “the water was not more than three or four feet déep according to old signs setting out there, and that he always noticed them. That’s no water there to stop us, at all; you’ve been kicking all along, about the slough being so bad, and I’ve been traveling here about thirteen or fourteen years; I never found this slough in as fine a fix as it is now in all my traveling here, and you acknowledge, yourself, you never saw it in such good fix; no water nor mud on the sides of the road; and that is the reason I wanted to come this road instead of the road around. Public roads are always kept up. I have traveled here when the roads were three times as bad, and also have crossed this slough, and more water there than seems to be there now.” They entered the water and again stopped.
Hubbell’s valise was on the floor of the buggy behind the seat. The driver asked if he had anything he didn’t want to get wet. Hubbell replied: “Yes, I don’t want my valise to get wet; go ahead and get it, though I don’t think the water will reach that high.” The driver then got the valise and put it on the seat. They started across. Giving the words of the driver: “We made a few steps when the horses commenced swimming. The water then struck us in the face and he *524 jumped and caught the lines; it seemed that he wanted to turn around. This pulled the horses out of the road when he pulled the lines and I caught hold of the lines to try to get back in the road, and I was going on all right and would have kept on all right if the buggy had not struck a stake driven into the ground; then the buggy hung. (This stake was not seen by him, nor was its presence known to him until the buggy struck it.) He asked me what I would do now. I told him I was going to cut the horses loose; Mr. Hubbell said, ‘let the horses alone and save me aild yourself. I will pay for the horses; I have paid for one pair and I will pay for these. Save me. Can’t yc/u swim?’ I told him, yes. He said, ‘you swim out and take me out on your back, for I can’t swim a lick.’ I told him we were directed to come this way and after I got here I would have turned around, but you said there was no danger, which I did not think there was myself, any further than just me getting wet. ‘I wish I had have let you turn around when you wanted to; but you heard Mr. Whitten say to me to keep right íd the middle of the road. Don’t you think no ways hard of me, Emmitt; do all you can to get me out of here. I said I could not swim with him on my back. ‘Well what in the world am I going to do, Emmitt? I am freezing. ’ I said, oh, no, you are not freezing, you are just a little cold; you have on better clothes than I have and I lack a heap from freezing. He then had hold of me when we were talking. He said, ‘I am afraid for you to leave me.’ I said, how am I to get you out? I can’t swim with you on my back. He then asked, ‘what am I going to do; how am I to get out?’ He said you must not leave me here at all. ’ I asked him, then, what *525 are we going to do; just stay here and drown? We will freeze or drown unless I go off and get a boat. He then turned me loose and told me to go and get a boat just as quick as I could. I left him then and started to hunt for a boat. I stepped into the water and tried to. swim and I failed to swim myself. He was talking to me the. whole time. ‘Emmitt you are drowning,' and what will I do?’ This he repeated time and again; and finally, at last, I got to the shore. He says, ‘Emmitt, go ahead, old boy. Mr. Eiland told me you are all right, and I believe you are; and also Mrs. Dillard. ’ I was now at the shore and used every effort tp get a boat.”
Cavett’s effort to get a boat in time proved unavailing. When help reached the scene, Hubbell was found out of the buggy drowned.
This extended statement of the circumstances surrounding the case, has been given because it seems to us that the facts, when fully stated, have the effect to much simplify the question of law involved.
The construction of the clause “voluntary exposure to unnecessary danger” has not heretofore been presented to this court, although the question has been the subject of numerous adjudications in other jurisdictions. A citation of the authorities, pro and con, will be found in the full briefs of counsel, which, with the able discussions of the legal propositions there so fully given, permits a disposal of the case with more brevity than might otherwise be fitting.
The policy covered, with the exception before stated, and others not important to be cited, death “through external, violent and accidental means.” It will not be doubted that the definition of “death *526 by accidental means,” given by the trial judge to the jury, viz: “Any event which takes place without the fore-sight or expectation of the person acted upon or affected by the event,” was a proper definition, and there is no reasonable question that the facts proven warrant the conclusion by the triers that the assured came to his death by accidental means. And it is now settled by uniform adjudication that although the drowning is the result of the action of water internally, yet the water is external, and that accidental death -by drowning is produced “through external, violent and accidental means,” within the import of an accident policy.
It being thus sufficiently shown by the evidence of plaintiff, that the assured came to his death within the general terms of the policy, the burden rested upon the company to prove that a recovery was defeated by reason of the exception pleaded, viz: that death was the result of “voluntary exposure to unnecessary danger.”
It is clearly not enough, in such ease, to show that the deceased was negligent. Negligence in its usual legal signification, has no place in measuring the liability of a company under an ordinary accident insurance policy, for its presence would overturn the primal theory of the contract. Accidents are the result very largely of the failure to observe due care, and yet the contract is intended as a remuneration in case of accident, and it is to procure the obligation of the company to pay this remuneration, that the assured pays the prem-' ium. As stated by Allen, J., in Keene v. Association, 161 Mass., 149: “By taking a policy of insurance against accidents, one naturally understands that he is to be indemnified against *527 accidents resulting in whole or in part from his own inadvertence.”
A literal construction of the words “voluntary exposure to unnecessary danger” might embrace any exposure not actually required by the circumstances, or enforced by the superior will of others, as well as every danger attending such exposure that might have been avoided by the exercise of ordinary care. But it must be borne in mind that language of exceptions in such policies, limiting the liability of the company, are to be construed favorably to the insured, and doubts and ambiguities resolved against the insurer. The words of the exception are not, therefore, to be literally interpreted. We think reason, as well as the clear weight of authority, leads to the conclusion that the words of the exception should be held to relate to dangers of a substantial character which the assured realized. The voluntary exposure requires an exercise of the will; the party must intentionally and consciously assume the risk. This necessarily involves knowledge that the danger exists, and that the risk will follow an attempt to brave it. The act done may be voluntary, but it cannot involve “voluntary exposure” unless the exposure is understood. Before the party can voluntarily expose himself to danger he must know of its existence. See Travelers' Ins. Co. v. Randolph, 78 Fed. Rep., 754.
We are not called upon to pass on the weight of evidence, but some features may, with propriety, be adverted to, and its general legal effect indicated. The policy describes Mr. Hubbell as engaged in the occupation of traveling salesman, and the contract was intended to cover risks incurred in the pursuit of that business. He was pursuing *528 this line of business, and was on one of the usual routes of travel, when he met his death. In the line of duty to his employer, it was important that he make Vienna without unreasonable delay, and unless the way involved substantial risk, it was his duty to reach that point that day. In this sense it was necessary for him to make the trip then. He had not gone out of his way to seek perils, nor for any ulterior or outside purpose, but was on a public highway, and the only one leading to his destination. It is a significant circumstance also, that no one whom he heard speak on this subject, indicated that the road itself was at all out of repair. The water on it was still, not running water, and hence it was not natural to anticipate any washing or impairment of the road. The presence of the back water over it was the only source of probable danger to be considered. Fords are common in many sections of the country, especially in the newer portions. To refuse to cross them is to refuse to travel. There is no evidence in the record that the road itself was out of order, and it was the belief of the prudent driver, even, that had the team been kept in the road, a safe crossing would have been made.
if the crossing of the ford at that time was dangerous,, and Hubbell was conscious of the danger, and consciously assumed the risk, that was a voluntary exposure to it, and would prevent a recovery. But the attempt to cross because it was a ford was not necessarily, and per se, a dangerous act, and plaintiff showed a right to recover unless the circumstances were such as disclosed to Hub-bell that the attempt to cross would be dangerous. This does not imply that he might recklessly, and in a fool-hardy way, rush into probable danger, *529 even though he was at the time pursuing his legitimate calling. But where different men, having substantially equal means of judging, would differ in opinion as to the safety of an act, it cannot be said to be fool-hardy. The attempt to cross under the conditions which surrounded Hubbell would be largely a matter of temperament. A very timid person would be likely to shrink and refuse; a courageous one would be likely to go ahead. The former would see troops of lions in the way; the latter would think the way clear. That Hubbell thought the way free from substantial danger, his conduct abundantly attests. His panicky grasping of the lines when the imminence of the peril dawned upon him, is not to be counted against him. Even under - the rule of contributory negligence his actions in the face of great peril, though unwise, would not condemn him. It is a recognized rule that where one is confronted with a sudden emergency, the failure on his part to exercise the best judgment possible, does not establish laek of care.
We think that Hubbell’s previous acquaintance with this ford, and the landmarks thereabouts, and the information received from others at the time, justified him in exercising his own judgment, and if he did so in good faith and in the belief that there was no danger to his life in crossing, however erroneously he judged, his act in attempting to cross was not a voluntary exposure to unnecessary danger. Nor was the warning of others more than a circumstance to be considered. Such warning was but the. expression of an opinion, and he had received opinions to the contrary. It was a part of the circumstances; it did not, of itself, for *530 bid the exercise of personal judgment. The question, therefore, of whether the attempted crossing was or not a voluntary exposure to unnecessary danger, was for the jury, and not, as now contended by plaintiff in error, solely a question of law to be determined by the court. Indeed, counsel, at the trial, seem to have regarded it as a question for the jury, as is indicated by their first request to charge.
We find no error in the charge given at the request of plaintiff below. The record shows as against the objections of plaintiff in error, that not only substantial but technical justice was done by the judgments of the superior and circuit courts, and they should not be disturbed
Judgment affirmed.